**In re MARFIN READY MIX CORP., Debtor.**

**Bankruptcy No. 095–72189–511.**

United States Bankruptcy Court,
E.D. New York.

April 28, 1998.

Weinberg, Kaley, Gross & Pergament, L.L.P., by Marc A. Pergament, Garden City, NY, for Debtors/Movants.

Paul A. Crotty by Kathleen J. Cahill, Corporation Counsel of City of New York, New York City.

## OPINION

### (Motion for Order Disallowing Claim and Determining Tax Liability)

MELANIE L. CYGANOWSKI,
Bankruptcy Judge.

### BACKGROUND

Marfin Ready Mix Corp. ("Marfin" or "Debtor") filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on July 26, 1995. Marfin owns real property located at 180–25 Liberty Avenue, Jamaica, New York (the "Property"). The City of New York, Department of Finance (the "City"), has assessed real property taxes against the Property which have not been paid. The City, in accordance with applicable statutory law, charges an interest rate of approximately 18% compounded daily on delinquent real estate taxes. Debtor's Affirmation In Support, ¶ 8. The City has charged this rate on the unpaid balance owing by the Debtor since approximately 1994, contending that it is statutorily entitled to do so until the tax bill is paid.

The Debtor argues that the rate is too high, and by way of the present motion pursuant to 11 U.S.C. §§ 105, 505 and 506, asks this Court to (a) reduce the City's claim with respect to unpaid real estate taxes for the tax years 1993/94, 1994/95 and 1995/96; (b) determine the interest rate to be charged by the City on delinquent real estate taxes, up to the date of filing and thereafter through full payment under a plan of reorganization;

and (c) determine the propriety of the City's compounding of interest on the Debtor's delinquent real estate taxes. *See* Debtor's Affirmation In Support, ¶ 2.

The City has not filed a proof of claim. *Id.*, ¶ 9. However, the City asserts in its papers that as of March 26, 1996, real estate taxes, water and sewer charges, and related charges, including interest at the statutory rate for real property taxes through April 30, 1996, and for water to March 27, 1996, have accrued on the Property in the amount of $213,259.45. This amount allegedly includes postpetition taxes of $49,358.07.

Insofar as is relevant here, the Debtor's plan of reorganization provides that the City will be paid in seventy-two equal monthly installments, plus interest at a rate fixed by this Court.[1] Unsecured creditors will be paid 5% of their claims in a lump sum in full satisfaction of their claims. The Debtor's sole shareholder, owed just over $100,000 for "shareholder loans and unpaid salary," will be paid 5% of his claim following the lump sum payment to unsecured creditors, and will be repaid in full after all payments are made to all senior classes of creditors. The sole shareholder will also receive 100% of the stock in the reorganized debtor in exchange for a cash infusion of $2,500.

The City has opposed the Debtor's motion, and both parties have briefed the issues. The following constitutes the Court's findings of fact and conclusions of law to the extent required by Fed.R.Bankr.P. 7052(a).

### DISCUSSION [2]

While the parties contest the interest rate to be applied to the delinquent taxes, neither

---

1. The plan was filed on March 20, 1996 and classifies the City as a secured creditor. Although the Debtor also filed an amended disclosure statement on July 30, 1996, the terms of the plan remained unchanged. The Debtor's plan of reorganization was confirmed by the Court at a hearing held on October 7, 1997. At the hearing, the parties reached an agreement as to the interest to be paid while this motion was *sub judice*. The parties agreed that the Debtor "shall cure all post-petition real estate taxes and water and sewer charges of the City of New York within thirty (30) days ... [and] shall satisfy its pre-petition obligation to The City of New York in forty-eight

(48) monthly installments, with interest at the statutory rate...."

2. The City argues at great length in both its "Affirmation in Opposition to the Debtor's Motion" and in its "Memorandum of Law in Opposition to the Debtor's Motion" that the statute of limitations for a challenge to real property tax assessments has expired, and may not now be revived. It appears, however, that the City has misconstrued the Debtor's motion as a challenge to the underlying assessments. Here, the Debtor concedes that it is not doing so. Accordingly, the Court will not address that branch of the City's argument.

distinguishes between the three distinct interest concepts which are implicated by the Debtor's motion. The City's claim to interest can be broken down into the following parts: (i) interest which accrued prepetition pursuant to Section 11–224 of the New York City Administrative Code ("Administrative Code")[3]; (ii) interest which accrues postpetition, but preconfirmation, pursuant to 11 U.S.C. § 506(b); and (iii) interest which must be paid postconfirmation during the pendency of the Debtor's plan pursuant to 11 U.S.C. § 1129.

Rather than objecting to each interest component, the Debtor launches several general attacks on the City's claim to 18% interest and argues that this Court has the equitable power to lower that rate on the grounds that (i) some portion of the 18% interest is really a disguised penalty; and (ii) the 18% rate is not "reasonable," and should be lowered to approximately 9%.

The City argues, of course, that the 18% statutory rate is the appropriate figure for all prepetition and postpetition time periods. Its principal contentions may be summarized as follows:

- since the Bankruptcy Code does not prescribe the appropriate rate of interest, the Court is bound to apply state law which, in this case, dictates an 18% rate;

- no portion of the 18% constitutes a "penalty," as the Administrative Code provides for the assessment of penalties in provisions separate and apart from those relating to interest; and

- the Debtor's reliance on a reasonable market rate might be persuasive if applied to a lending institution, but not when applied to an involuntary creditor, such as a sovereign which is seeking revenue to defray the costs of government.

**3.** Section 11–224(g) of the Administrative Code provides in pertinent part:

No later than the twenty-fifth day of May of each year, the banking commission shall transmit a written recommendation to the council of a proposed interest rate to be charged for nonpayment of taxes on real estate.... In

## A. The Claim for Taxes Accruing Prepetition and the Interest Rate to be Applied

### 1. Interest Rate for the Prepetition Period

The Debtor's initial argument is that a portion of the 18% rate is a disguised penalty, despite the fact that the Administrative Code does not label it as such. A penalty is that portion of a tax obligation which is punitive, not compensatory, in nature. *See In re Hovan, Inc.,* 96 F.3d 1254, 1259 (9th Cir.1996). The purpose of interest is to compensate for the loss of monetary value, while a penalty is typically charged for a failure to act by a certain deadline. *Id.* The City bristles at the Debtor's characterization of the statutory rate as a penalty, contending that its rationale in determining the interest rate is not to punish, but simply to cover the cost of using the City's money. NYC's Mem. In Opp., at 20. The City's assertion goes largely unsubstantiated, but the Debtor's claim that the rate includes a punitive aspect is equally conclusory and bare of evidentiary support.

The most telling evidence of whether the interest rate applied by the City includes a punitive portion is found in the Administrative Code itself. First, while the Court is certainly not bound by the statutory label, the Court considers the label as some evidence of the character of the charge. This is particularly true where, as here, the statute contains a separate provision which characterizes a different charge as a penalty. Section 11–407 of the Administrative Code, entitled "Redemption," also speaks to the consequences of nonpayment of taxes. *Id.* Subsection (c) of § 11–407 reads, in relevant part: "[A] late redemption payment shall consist of all taxes and charges owing on said parcel, the lawful interest thereon to the date of payment *and a penalty of five percent* of said payment of taxes, charges and interest...." (emphasis added).

making such recommendations the commission shall consider the prevailing interest rates charged for commercial loans extended to prime borrowers by commercial banks operating in the city and shall propose a rate of at least six percent per annum greater than such rates....

The Court believes that this passage supports the view that when the State's legislators wanted to impose a penalty for nonpayment, they made a specific provision for it in the statute. The Court of Appeals for the Ninth Circuit relied on similar reasoning in its *Hovan* decision, when it described tax penalties levied in addition to interest as being punitive. *In re Hovan, Inc., supra*, 96 F.3d at 1258 (quoting *In re Healis*, 49 B.R. 939, 942 (Bankr.M.D.Pa.1985)). While § 11–407 levies the penalty as a result of late *redemption* rather than late *payment*, the fact that the penalty charge is recited explicitly lends credibility to the notion that the legislators did not intend any part of the interest rate imposed by § 11–224 to be punitive.

Secondly, the Administrative Code specifically links the interest rate to be charged on unpaid taxes to the prevailing market rates on commercial loans. Section 11–224 specifically requires the banking commission to consider, in its calculation of the rate to be charged, the "prevailing interest rates charged for commercial loans extended to prime borrowers by commercial banks operating in the city" and ties the City's rate to those figures. This language is consistent with the notion that the City's motivation is to compensate itself for the time value of money, and not to punish recalcitrant taxpayers.

Thirdly, the Court relies on the exhaustive analysis set forth in *In re Navis Realty, Inc.*, 193 B.R. 998 (Bankr.E.D.N.Y.1996) (Holland, J.), which need not be repeated here. Upon scrutinizing the very statute at issue here, namely, § 11–224, the *Navis Realty* court held that no portion of the interest rate set forth therein constitutes a penalty.[4]

Lastly, the Debtor has not presented any evidence whatsoever, in the form of case law or legislative history, to support its claim that a portion of the interest rate constitutes a penalty. *In re Liuzzo*, 204 B.R. 235, 239 (Bankr.N.D.Fla.1996) (creditors should receive the interest rate dictated by the statutes under which their liens arise, unless the debtor presents evidence that "the statutory interest rate is a penalty or the application of the statutory rate would lead to an inequitable or unconscionable result").

■ Furthermore, with respect to *pre* petition interest, the Debtor has failed to identify any legal consequence which might follow were it successful in arguing that a portion of the 18% constitutes a penalty. While it may be true that in a Chapter 7 case, a trustee may avoid any lien that secures a claim for prepetition penalties to the extent that the penalties are not compensation for actual pecuniary loss, *see* 11 U.S.C. §§ 724(a), 726(a)(4), a parallel provision does not exist in chapter 11. *In re Specialty Cartage, Inc.*, 115 B.R. 164, 167 (Bankr.N.D.Ind.1989), *aff'd on other grounds*, 113 B.R. 484 (N.D.Ind.1990) (holding that §§ 724 and 726 do not apply in chapter 11; "Congress fully intended that the Code and the bankruptcy court would recognize and respect the validity of a lien securing a claim for penalties in Chapter 11, even though that lien would receive dramatically different treatment under Chapter 7"); *In re Guyana Development Corp.*, 189 B.R. 393 (Bankr.S.D.Tex.1995) (liens securing penalties imposed by IRS not avoidable in chapter 11, and IRS entitled to treatment of its secured claim under 11 U.S.C. § 1129).

All of the cases cited by the Debtor which arguably allow equitable considerations to dictate appropriate rates of interest deal with 11 U.S.C. § 506(b), which governs *post* petition interest. *See In re Princeton Overlook Joint Venture*, 1993 WL 280456 at *9 (Bankr. D.N.J. Mar.16, 1993) ("Clearly the court does not have the power to modify accrued prepetition interest"). Although the Debtor also cites 11 U.S.C. § 105, the Court's research has revealed no case in which a bankruptcy court, under the equitable rubric of Section 105, has engaged in wholesale emasculation of a state legislative scheme with respect to prepetition interest rates—and the Debtor has cited to none. Therefore, the Court holds that the City was and is entitled to charge, prior to the filing of a bankruptcy

---

**4.** The *Navis Realty* court was not requested, however, to consider whether the compounding of the interest rate by the City constitutes a penalty. *See* discussion *infra* at 158–59.

petition, interest at the rate set forth in the Administrative Code.

### 2. Interest Rate for the Postpetition / Preconfirmation Period

■ Section 506(b) of the Bankruptcy Code provides:

(b) To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement under which such claim arose.

Section 506(b) affects "the quantum of the allowed secured claim and provides exception to the general rule that interest stops accruing as of the filing of the petition." *In re Harko*, 211 B.R. 116, 118 (2d Cir. BAP 1997), *aff'd sub nom. In re Milham*, 141 F.3d 420 (2d Cir.1998). Section 506(b) entitles an oversecured creditor to postpetition interest, which becomes part of the creditor's allowed claim. *Rake v. Wade*, 508 U.S. 464, 471, 113 S.Ct. 2187, 2192, 124 L.Ed.2d 424 (1993) (interest is "part of the oversecured claim under § 506(b)"). *See also In re Foertsch*, 167 B.R. 555, 560 (Bankr.D.N.D.1994) (section 506(b) allows the oversecured creditor to enhance its claim by adding to it postpetition interest); *In re Busone*, 71 B.R. 201, 203 (Bankr. E.D.N.Y.1987) (Goetz, J. (ret.)); *In re Hugee*, 54 B.R. 676, 678–79 (Bankr.D.S.C.1985) ("The creditor is entitled to receive the contract rate of interest until the effective date of the plan—at which time the accumulated interest becomes a part of the allowed secured claim"). Thus, the "allowed amount" of the oversecured creditor's claim will include, for purposes of 11 U.S.C. § 1129, a sum representing postpetition interest. The interest allowed under § 506(b) accrues from the date the petition is filed until the effective date of the plan of reorganization. *In re Beare Co.*, 177 B.R. 883 (Bankr.W.D.Tenn. 1994); *see also In re Milham*, 141 F.3d 420, 423–24 (2d Cir.1998)(chapter 13 case).

■ Although bankruptcy courts were divided as to whether Section 506(b) entitled a creditor to postpetition interest only where such interest was provided for by agreement, *i.e.*, only to consensual creditors, the United States Supreme Court resolved the issue in *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989), when it held that nonconsensual, statutory, oversecured creditors are entitled to recover postpetition interest under 11 U.S.C. § 506(b).[5] Accordingly, oversecured tax lien claimants such as the City are entitled to postpetition interest under Section 506(b). *See also In re Parr Meadows Racing Ass'n. Inc.*, 880 F.2d 1540, 1549 (2d Cir.1989) (county entitled to postpetition interest on tax lien claims under Section 506(b)).

Neither the language of § 506(b) nor *Ron Pair* dictates the *rate* of postpetition interest to be paid. *See In re Greensboro Lumber Co.*, 183 B.R. 316 (Bankr.M.D.Ga.1995). On that point, the cases remain divided. Some hold, without much fanfare, that where a lien is created by statute, the rate of interest to be paid under Section 506(b) is the rate set forth in the statute which created the lien. *Id.* (holding that the IRS was entitled to the rate of interest set forth in the Internal Revenue Code on its oversecured tax lien claim); *In re Isley*, 104 B.R. 673 (Bankr. D.N.J.1989) (allowing interest at statutory 18% rate to county taxing authority); *In re Busone, supra* (allowing 12% statutory interest on county's tax claim). Others have simply assumed the same, without discussion. *See In re Parr Meadows Racing Ass'n. Inc., supra*, 880 F.2d at 1549 (county entitled to postpetition interest on tax lien claims at statutory rate under Section 506(b)).

Some courts have stated that despite the existence of a state statute fixing the interest to be paid on statutory liens, the court has discretion to engage in a sort of case-by-case equitable balancing analysis, wherein the competing interests of the secured and unsecured creditors are somehow harmonized.

**5.** The decision in *Ron Pair* also makes clear that if the Debtor had succeeded on its argument that a portion of the City's interest rate constitutes a penalty, it would not be entitled to allowance of that sum under § 506(b), since fees, costs and charges are not allowed in the absence of an agreement. *In re Parr Meadows Racing Ass'n. Inc.*, 880 F.2d 1540, 1549 (2d Cir.1989).

*See, e.g., In re Kalian,* 178 B.R. 308 (Bankr. D.R.I.1995) (stating, entirely in *dictum,* that a bankruptcy court has discretion to balance appropriately the interests of the lien claimant and those of junior creditors); *In re DeMaggio,* 175 B.R. 144 (Bankr.D.N.H.1994) (the court may exercise discretion in determining the rate of interest, taking into consideration the "equities"); *In re Wasserman v. City of Cambridge,* 151 B.R. 4, 5 (D.Mass. 1993) (in holding that the statutory rate failed to "provide the right balance between the interests of the creditors and the debtors," the court observed that it must "examine the equities," and interest at only the federal judgment rate would be allowed where unsecured creditors would be directly harmed by imposing interest at the statutory rate).

The approach taken by the apparent majority of courts is somewhat more restrictive. Most courts which have visited the issue have concluded that a bankruptcy court is not necessarily bound by the state statutory rate, but should be reluctant to deviate from that rate except in very limited circumstances. *See, e.g., In re Liuzzo, supra,* 204 B.R. at 239; *In re Navis Realty, supra,* 193 B.R. at 1017–18 (where, in connection with the same creditor and tax statute that are at issue here, the court held that a bankruptcy court should deviate from the statutory rate only where the statutory rate is a penalty, where imposition of the statutory rate would cause the unsecured creditors direct harm, and where it would impede the debtor's "fresh start"); *Galveston Indep. School Dist. v. Heartland Fed. Savs. & Loan Assoc.,* 159 B.R. 198, 204 (S.D.Tex.1993) (holding creditors should be allowed the rate of interest dictated by the statutes under which their liens arise, "provided the charge can be reasonably characterized as true interest rather than a penalty").

The Court of Appeals for the Seventh Circuit in *In re Lapiana,* 909 F.2d 221 (7th Cir.1990), posited a classic law-school hypothetical to illustrate yet another situation in which deviation from the statutory rate would be appropriate, *i.e.,* where the IRS conspired with the trustee by compensating him to delay payments to the IRS and conceal the same from junior creditors, all for the purpose of allowing the IRS to earn a high interest rate at the expense of junior creditors. The actual facts in *Lapiana* were as follows: the bankruptcy court approved a sale of assets encumbered by an IRS lien and by a junior judgment lien, and ordered the proceeds paid to the IRS in partial satisfaction of its lien. The trustee did not do so for some twenty months (in fact, he had embezzled the rest). Thereafter, a second asset was sold, and the IRS claimed a right to all of the proceeds, since the unpaid tax plus interest which had accrued at the statutory rate exceeded the net proceeds of the second sale. The bankruptcy judge held that the government had forfeited its rights in seeking § 506(b) interest by dragging its feet in collecting the proceeds of the first sale. The Seventh Circuit framed the issue by inquiring whether *Ron Pair* completely extinguishes the power of a bankruptcy judge to abate an award of interest to an oversecured creditor. The Court held that it does not, but concluded that an abatement of interest was not warranted on the facts of the case. In so doing, the Court of Appeals expressed its reluctance to deviate from the statutory rate:

It is true of course that bankruptcy, despite its equity pedigree, is a procedure for enforcing pre-bankruptcy entitlements under specified terms and conditions rather than a flight of redistributive fancy or a grant of freewheeling discretion such as the medieval chancellors enjoyed (equity itself is no longer a discretionary system in that sense). The government's tax claim against the [debtors] is one of those pre-bankruptcy entitlements and section 506(b) specifies one of the terms for enforcing it. But the specification need not be considered exhaustive. A rigid literalism is not the only alternative to discretionary justice. A statute that says "shall" does not, by its imperative mood, extinguish all defenses. We have no reason to suppose that the statute was intended to cut off the defense of estoppel and we may assume that other defenses, such as the statute of limitations, survive as well. The point of *Ron Pair* was to give involuntary liens parity with voluntary ones so far as the applicability of section 506(b) was con-

cerned, rather than to abolish defenses against claims under that section.

But this is not to say that section 506(b) is an invitation to a free-for-all equity-balancing act. That would be a swing to the opposite extreme. We deprecate flaccid invocations of "equity" in bankruptcy proceedings. Creditors have rights, among them the right of oversecured creditors to post-petition interest, and bankruptcy judges are not empowered to dissolve rights in the name of equity. Flexible interpretation designed to allow the judicial interpolation of traditional defenses in a statute silent on defenses is one thing; standardless decision-making in the name of equity is another. *Ron Pair* makes clear that section 506(b) provides more than merely "guidance in the exercise of [the bankruptcy court's] equitable powers." If the statute were read merely to authorize the bankruptcy judge to award post-petition interest as a matter of grace, secured creditors would lack a clear idea of what their rights would be if the debtor went broke.

*Lapiana, supra,* 909 F.2d at 223–24. The Court of Appeals went on to hold that the elements of estoppel against the government had not been shown and that the Court would not create "a new defense of uncertain boundaries and dubious compatibility with the rules on estopping the government." *Id.* at 225.

There are other good reasons supporting the view that the bankruptcy court should allow interest at the rate set forth in a state's legislative scheme absent a compelling interest to the contrary. First, adoption of a "market rate" approach would leave "an unresolved fact issue in every bankruptcy case, which would require litigation for every new day's market." *Galveston Indep. School Dist. v. Heartland Fed. Savs. & Loan Assoc., supra,* 159 B.R. at 204. Secondly, a legislative tax scheme designed to raise revenue to pay the costs of government is different from a commercial transaction where the parties have bargained for their rights, since "title insurance, hazard insurance, and other lender protections, which are included in standard mortgage agreements, are lacking...." *In re Liuzzo, supra,* 204 B.R. at 240. The Court agrees, for the reasons set forth in *Liuzzo,* that involuntary creditors are in some sense worse off than voluntary ones, who have had the ability to bargain for other protections and can therefore extend a lower rate of interest.

 For these reasons, this Court aligns itself with the latter line of cases, and believes that it possesses the power to modify rights created by state law or private agreement. Indeed, the Bankruptcy Code itself contains many provisions which specifically modify or abrogate such rights. *See, e.g.,* 11 U.S.C. §§ 362, 522(f), 543, 547. The Code is also replete with instances in which Congress has made such a power explicit. *See, e.g.,* 11 U.S.C. §§ 363(*l*), 365(e)(1), 545, 1123(b), 1322(b). However, where that power is *not* explicit—where it resides only in general language directing the Court to allow interest on an oversecured claim—the Court should be loathe to exercise it in the absence of compelling evidence that recognition of a right created by state statute or private agreement would do violence to the principles which constitute the foundation of bankruptcy law. There is no such evidence in the present case.

Here, the Debtor simply contends that 18% is not a "reasonable" rate, and the Court should therefore lower it to 9%.[6] Most of the cases cited by the Debtor deal with the application of *contract* rates of interest, and involve a determination as to whether a pre-default contract rate or a default contract rate is more appropriate. *See In re Laymon,* 958 F.2d 72 (5th Cir.1992) (concluding that the contract provides the rate of postpetition interest, but where the contract contains two rates, a pre-default rate and a

---

**6.** Specifically, the Debtor argues:
The rate of 18% is not a reasonable rate, considering that the City of New York takes the position, and correctly so, that it is a secured creditor which is in the first position ahead of all mortgages and all other debts with respect to the Property. The rate of 18% is more akin to interest rate charge for unsecured debt such as credit card lenders. A reasonable market interest rate for a first mortgage is typically between 8% and 10% per annum.
*See* Debtor's Affirmation in Support, ¶¶ 10–12.

default rate, courts may take a flexible approach based upon an examination of the equities); *In re DWS Investments, Inc.*, 121 B.R. 845 (Bankr.C.D.Cal.1990) (holding that since section 506(b) does not say how interest is to be determined, the court has discretion to balance the equities, and concluding that since the creditor had not shown that the default rate bore any relationship to actual or projected loss as a result of nonpayment or approximated market rate for similar loans with borrowers in similar circumstances, and since the estate was insolvent and unsecured creditors would be unlikely to receive a distribution unless the plan was confirmed, that the default rate was inappropriate); *In re Laza*, 69 B.R. 669 (Bankr.E.D.N.Y.1987) (concluding, prior to *Ron Pair*, that since the phrase "interest on such claim" is set off by commas, it is independent of the modifying clause "provided under the agreement" and, accordingly, the creditor would be allowed a "reasonable post-petition interest rate approved on a case by case basis"); *In re W.S. Sheppley & Co.*, 62 B.R. 271, 278 (Bankr. N.D.Iowa 1986) (relying upon *Vanston Bondholders Protective Committee v. Green*, 329 U.S. 156, 67 S.Ct. 237, 91 L.Ed. 162 (1946), and concluding that "flexibility is possible in determining whether default rate of interest should be allowed in a particular reorganization proceeding. The rationale of the *Vanston* case, in terms of balancing the equities, still applies under the present non-specific provisions of § 506(b)").

The City responds that the Debtor's reliance on a reasonable, but undefined, commercial market rate is misplaced, since "market" rates may apply to a lending institution, but have no relevance to an "involuntary" creditor, such as a sovereign seeking revenue to defray the costs of government. It therefore argues that the Debtor's cases are inapplicable here.

Although the City does not clearly articulate the rationale underlying the distinction it draws, the Court believes that the distinction is real—and that there are good reasons for taxing authorities to exact a higher interest rate when taxes go unpaid than do consensual mortgagees when lending money.[7] The interest rate paid to a mortgagee is but one variable in the equation constituting the mortgage transaction. Others exist: the length of time in which the note will be repaid, the loan-to-value ratio, the ability (or lack thereof) to adjust interest rates over the term of the loan to reflect changes in the economy, and the payment, at the inception of the loan, of a charge equal to one percent of the principal amount of the loan in addition to interest (the mortgage "points"). All are open to negotiation, and the assignment of a value to one variable during the bargaining process will invariably affect the values assigned to the others. Yet the taxing authority has control over nothing but the interest rate. The taxes may go unpaid for one year or ten, the property may, for a variety of reasons, decline in value and become worth less than the taxes owed, and yet, the taxing authority has no ability to collect payment up front in the form of "points." While one may not agree with the result—who, indeed, likes or wants to pay taxes?—one must at least concede that there is a justification underlying a government's exaction of an interest rate higher than that imposed by a mortgagee.

Although the Debtor asserts that the 18% rate is more typical of the rates charged by *unsecured* creditors, and is therefore unfair when charged by secured creditors, the Court has difficulty ignoring the City's inability to bargain for lender protections typically

7. *But cf. In re Kelton*, 137 B.R. 18 (Bankr. W.D.Tex.1992), wherein the Court stated:

There are no special equities raised by the fact that the interest claim asserted here happens to be held by a taxing authority. That the creditor is "involuntary" in the sense that no credit was intended to have been extended to this debtor does not change that creditor's position as a competing claimant for the estate's limited assets as part of the larger distribution scheme in bankruptcy.
*Kelton, supra,* 137 B.R. at 21. However, the *Kelton* court relied in large part on its own opinion in *In re Laymon*, 117 B.R. 856 (Bankr. W.D.Tex.1990), which was later reversed by the Fifth Circuit. *See In re Laymon*, 958 F.2d 72 (5th Cir.1992). The persuasiveness of *Kelton* has therefore been significantly diluted. *See also In re Navis Realty, supra.*

built into a consensual secured transaction, such as title insurance and hazard insurance. *In re Liuzzo, supra,* 204 B.R. at 240. The Debtor may be uninsured and the property may burn to the ground, leaving the City with no security for repayment. In addition, some differential between tax rates and commercial rates may be required to encourage prompt tax payments. *In re DeMaggio, supra.*

The Debtor in this case has not presented any evidence of affirmative misconduct by the City. *In re Lapiana, supra.* Nor has it shown that application of the statutory rate would cause direct harm to the unsecured creditors, or would impede its fresh start. In fact, the Debtor's plan proposes to unsecured creditors five percent of their claims, regardless of the rate of postpetition interest allowed on the City's claim. This is not a "pot" plan, in which a limited pool of assets is available for distribution to creditors and in which payment to senior creditors necessarily results in reduced payments to unsecured creditors. Rather, the Debtor's plan will be funded through its continued operations. In fact, after the unsecured creditors have received their five percent, remaining funds will be used to repay a loan to the Debtor's principal. That principal will also receive shares in the reorganized Debtor, and will be the beneficiary of any corporate retained earnings which may remain after payment to creditors. Reducing the interest rate paid the City will not benefit unsecured creditors,

and this is not a case in which equity must intervene.

Accordingly, the Court hereby allows to the City, pursuant to 11 U.S.C. § 506(b), postpetition interest, from the date of the filing to the effective date of the plan, at the rate set forth in the Administrative Code.

### 3. Interest Rate for the Postconfirmation Period

An oversecured creditor is entitled to receive interest pursuant to § 506(b) only until the effective date of the plan. At that time, the accumulated interest becomes part of the creditor's allowed secured claim and, pursuant to 11 U.S.C. § 1129 [8], the plan must provide for payment to the creditor of at least the present value of such allowed claim. *United Savings Ass'n of Texas v. Timbers of Inwood Forest,* 484 U.S. 365, 377, 108 S.Ct. 626, 633–34, 98 L.Ed.2d 740 (1988); *In re Valenti,* 105 F.3d 55, 63 (2nd Cir.1997), *overruled on other grounds, Associates Commercial Corporation v. Rash,* —— U.S. ——, 117 S.Ct. 1879, 138 L.Ed.2d 148 (1997); [9] *Milham, supra.* The concept of present value, in simple terms, can best be expressed by the following illustration: "a dollar in hand today is worth exactly the same as (1) a dollar to be received a day, a month or a year hence *plus* (2) the rate of interest which the dollar would earn if invested at an appropriate interest rate." *In re Beare Co., supra,* 177 B.R. at 885. A creditor who receives the present value of its claim is placed in the same economic position that it would have

---

**8.** 11 U.S.C. § 1129 provides, in relevant part:

(b)(2) For the purposes of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:

(A) With respect to a class of secured claims, the plan provides—

(i) (I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and

(II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property . . . .

It is to be noted that the language set forth at 11 U.S.C. § 1129(b)(2)(A)(i)(II), entitling a secured creditor to the present value of its collateral, is substantively identical to the language of 11 U.S.C. § 1325(a)(5)(B)(ii), and most courts interchangeably apply the analysis used under one section to the other. *In re DeMaggio, supra,* 175 B.R. 144. Therefore, cases discussing the concept of "present value" interest under the chapter 13 plan are persuasive even in the chapter 11 context. *Rankin v. DeSarno,* 89 F.3d 1123 (3d Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 943, 136 L.Ed.2d 832 (1997).

**9.** The *Rash* decision criticized *Valenti's* view with respect to the valuation of collateral, but left undisturbed *Valenti's* statement that a secured creditor must receive the present value of its claim. In addition, *Rash* does not address the concept of "present value interest".

been in had it received the value of its allowed claim on the date the plan was confirmed. *Valenti, supra,* 105 F.3d at 63. The Court must therefore determine the interest rate which will "serve as the measuring standard by which the Court can evaluate whether deferred payments under the terms of the plan have a value as of the effective date of the plan equal to the allowed claim," and which will compensate the secured creditor for the delay in payment of its claim.[10] *In re Beare Co., supra,* 177 B.R. at 885. The interest rate selected is, therefore, not necessarily the same interest rate used to determine the allowed amount of the claim under Section 506(b). *In re DeMaggio, supra,* 175 B.R. at 150.

[11] It is settled in this Circuit that in order to compensate the City for its inability to use the funds owed to it during the pendency of the plan and to preserve the present value of the City's claim, the Debtor must pay a "market" rate of interest in addition to payments on the allowed secured claim. *Valenti, supra,* 105 F.3d at 63; *In re Bellamy,* 962 F.2d 176, 185–86 (2d Cir.1992), *overruled on other grounds, Nobelman v. American Savings Bank,* 508 U.S. 324, 113 S.Ct. 2106, 124 L.Ed.2d 228 (1993); *In re Milham, supra.* Requiring the Debtor to pay interest at the statutory rate would be inconsistent with the language and objective of § 1129, which requires that a creditor be paid the present value of its claim. *Cf. Milham, supra* (stating that substituting contract rate for present value interest under Section 1325 would run afoul of *Valenti,* which rejected the "forced loan" approach).

Of the several approaches used to determine market rates of interest (*compare General Motors Acceptance Corp. v. Jones,* 999 F.2d 63 (3d Cir.1993),[11] *with United Carolina Bank v. Hall,* 993 F.2d 1126 (4th Cir. 1993)), it is also settled in this Circuit that the market rate of interest "should be fixed at the rate on a United States Treasury instrument with a maturity equivalent to the repayment schedule under the debtor's reorganization plan." *Valenti, supra,* 105 F.3d at 64. In addition, the court should include a premium, of from one to three percent, "to reflect the risk to the creditor in receiving deferred payments under the reorganization plan." *Id.; see also In re Milham, supra; In re Smith,* 178 B.R. 946 (Bankr.D.Vt.1995) (Conrad, J.) (Chapter 12 case).

Selection of the premium to be paid will depend upon the circumstances, including the debtor's payment history "as well as the viability of the reorganization plan." *Valenti, supra,* 105 F.3d at 64. In this case, neither party has provided the Court with evidence respecting the current rates on United States Treasury instruments with a maturity equivalent to the repayment schedule under the present plan. Presumably, the parties will be able to stipulate as to the applicable rate and a reasonable risk premium. In the event that they cannot, the Court will hold a further evidentiary hearing.

### 4. Compound Interest

No section of the Bankruptcy Code deals directly with the compounding of inter-

---

10. The Code permits the debtor to modify the rate of interest paid to a secured creditor post-confirmation (as opposed to post*petition, i.e.,* the intervening time period between the filing date and the effective date of a plan). Section 1123(b)(5) provides that Chapter 11 plans may "modify the rights of holders of secured claims, *other than a claim secured only by a security interest in real property that is the debtor's principal residence.*" (Emphasis added). 11 U.S.C. § 1123(b)(5). The City is not protected by the language of § 1123(b)(5) for two reasons: first, the antimodification exception is limited to the rights of the mortgagee of the debtor's principal residence. *In re Harko, supra* (construing similar language found in the parallel provision governing Chapter 13, *i.e.,* § 1325(b)(2)); *In re Dingley,* 189 B.R. 264, 269 (Bankr.N.D.N.Y.1995). In

addition, statutory tax liens do not constitute "security interests." 11 U.S.C. § 101(51), (53); *Rankin v. DeSarno, supra,* 89 F.3d at 1127 (holding similarly for purposes of § 1322(b)(2)); *In re DeMaggio, supra,* 175 B.R. at 146–47 (holding that nonconsensual tax liens do not fall within antimodification provision of Section 1322).

11. The *Jones* decision dealt with the rate of interest to be paid to a commercial creditor and adopted a "coerced loan" theory. Significantly, the Court of Appeals for the Third Circuit in the later case of *Rankin v. DeSarno, supra,* held that the present value interest rate to be paid a statutory tax creditor, as opposed to a commercial lender, should be the statutory rate. 89 F.3d 1123.

est on a secured tax claim, or with the method of computation permissible for interest awarded under Section 506(b). As a general rule, under New York law, compound interest is disfavored, *Rourke v. Fred H. Thomas Assoc.,* 616 N.Y.S.2d 160, 162 Misc.2d 41 (Sup.Ct.1994), and is not allowed in the absence of an express contract [12] *or statutory authority. In re Schuster's Will,* 3 N.Y.S.2d 702, 167 Misc. 194 (Sur.Ct.1938), *aff'd* 257 A.D. 55, 12 N.Y.S.2d 20 (1939), *aff'd* 284 N.Y. 569, 29 N.E.2d 392 (1940) (emphasis added). In this case, there exists statutory authority in the form of Section 11–123 of the Administrative Code. That section, entitled "Interest compounded daily" reads: "In computing the amount of any interest required to be paid under section 11–224 ... of the code, such interest shall be compounded daily."

Nevertheless, the Debtor argues that compound interest should not-be allowed in this case, because the Debtor is allegedly insolvent.

To fully understand the underlying legal principles, one must return to the past and examine the historical roots of the award of postpetition interest in bankruptcy. The Bankruptcy Act of 1898 (the "Act") contained no counterpart to the present Section 506(b), and no provision governing the payment of postpetition interest. In early cases interpreting the Act, the general rule was that interest on debt stopped accruing at the moment the petition was filed. In the case of *Sexton v. Dreyfus,* 219 U.S. 339, 31 S.Ct. 256, 55 L.Ed. 244 (1911), the following question arose: a secured creditor sold its security some time after the filing of the petition, but the proceeds were insufficient to pay the full amount of its claim. The referee in bankruptcy permitted the creditor to apply the proceeds first to postpetition interest, then to principal, and to "prove for the balance." The Supreme Court, speaking through Justice Holmes, reversed, stating the rule as follows:

> For more than a century and a half the theory of the English bankrupt system has been that everything stops at a certain date. Interest was not computed beyond the date of the commission. This rule was applied to mortgages as well as to unsecured debts; and notwithstanding occasional doubts, it has been so applied with the prevailing assent of the English judges ever since.... [T]he rule was laid down not because of the words of the statute, but as a fundamental principle. We take our bankruptcy system from England, and we naturally assume that the fundamental principles upon which it was administered were adopted by us when we copied the system, somewhat as the established construction of a law goes with the words where they are copied by another state.... The rule is not unreasonable when closely considered. It simply fixes the moment when the affairs of the bankruptcy are supposed to be wound up.

*Id.* at 344, 31 S.Ct. at 257 (citations omitted). The Court also drew an analogy to the general rule in cases involving insolvent banks, where it had been held that the principle of equality of distribution to creditors precluded a distribution based upon interest accruing after the date of the bank's failure. *See, e.g., White v. Knox,* 111 U.S. 784, 4 S.Ct. 686, 28 L.Ed. 603 (1884).

Nevertheless, bankruptcy courts, true to their equity pedigree, developed several exceptions to the general rule against postpetition interest, two of which are particularly relevant here.[13] *See, e.g., In re Southeast Banking Corporation,* 188 B.R. 452, 462 n. 5 (Bankr.S.D.Fla.1995), *aff'd,* 212 B.R. 682 (S.D.Fla.1997). In the case of *Johnson v. Norris,* 190 F. 459 (5th Cir.1911), there re-

**12.** The Court notes that § 5–527 of New York State's General Obligations Law, entitled "Enforceability of compound interest," condones the accrual of interest upon unpaid interest for "loans and other agreements." N.Y. Gen. Oblig. L. § 5–527 (McKinney's 1989 and Supp.1992).

**13.** The third exception to the general rule was recognized in the *Sexton* case. The Supreme Court stated that where the security for the debt paid interest and dividends after the date of the filing, the creditor could apply them to "after accruing interest", since "[t]here is no more reason for allowing the bankrupt estate to profit by the delay beyond the day of settlement than there is for letting the creditors do so. Therefore to apply these subsequent dividends, etc., to subsequent interest, seems just." 219 U.S. at 346, 31 S.Ct. at 258.

mained a surplus in the estate after paying all creditors the principal amount of their debts in full, including interest to the date of the filing of the petition. The trustees sought to turn over the surplus to the debtors, and the creditors opposed the application, contending that before a surplus was returned to the debtors, they should be paid the interest accruing on their claims after the filing date and until the date of payment. The Fifth Circuit concluded that the rule which prevented the accrual of interest after the filing was not intended to be applied to a solvent estate, as it "was not in the contemplation of Congress that a solvent estate would be settled in the bankruptcy courts." *Id.* at 462. The Court of Appeals further recognized that "it is a very rare occurrence that a surplus is left after paying the principal and interest to the date of the filing of the petition," *id.* at 461, and noted the absence of any provision in the Act directly governing the distribution of a surplus estate or the payment of postpetition interest. Pointing out that under general legal principals, a debtor must pay interest up to the time he pays his debt, the Court stated that "[i]f the bankruptcy act does not control, the general law does." *Id.* at 463. It therefore held as follows:

> Whether we are governed by the apparent intention of Congress as shown by the general purpose of the bankruptcy law, or by the general principles of equity, the result would be the same. The bankrupts should pay their debts in full, principal and interest to the time of payment, whenever the assets of their estates are sufficient. The balance then remaining should be returned to the bankrupts.

*Id.* at 466. As a consequence, a so-called "solvency" exception evolved which provided that whenever the estate was sufficient to pay all creditors in full, *i.e.*, when the estate was solvent, creditors were entitled to postpetition interest until the time of payment before a surplus was returned to the debtor.

The second exception to the rule against postpetition interest is illustrated by the case of *Coder v. Arts,* 152 F. 943 (8th Cir.1907), *aff'd,* 213 U.S. 223, 29 S.Ct. 436, 53 L.Ed. 772 (1909). In that case, a secured creditor holding a first mortgage on the debtor's property was owed approximately $98,000, and he filed a claim for that amount shortly after the debtor filed for bankruptcy in 1904. In 1906, the trustee sold the mortgaged property free and clear of the mortgage, for the sum of $135,000. From the proceeds, the court allowed to the mortgagee the principal of his debt and interest to the date he filed his claim. The creditor appealed, claiming he should have been allowed interest until 1906, when the proceeds of the sale were collected. Under the terms of the note and mortgage, the mortgagor had agreed to pay interest until the mortgage was paid. The Court of Appeals for the Eighth Circuit held that the agreement was valid and binding and "ran with the land," such that the trustee held the proceeds subject to the agreement. The Court stated:

> Another rule might prevail if the proceeds of the mortgaged property were insufficient to pay the mortgage debt and its interest in full and the mortgagee was seeking to collect an unpaid balance by sharing with other creditors in the distribution of the common property. He might not be entitled, then, to recover from the proceeds of the common property interest upon his debt to any later date than the unsecured creditors would recover interest upon their claims. But the proceeds of these mortgaged lands appear to be ample to pay the principal and interest of the debt to the mortgagee ... and where a trustee sells mortgaged property of the bankrupt's estate free of the mortgage, and the proceeds of the sale are sufficient for that purpose, the mortgagee is entitled to payment of the interest upon his mortgage debt as well as the principal, out of the proceeds in accordance with the terms of the note and mortgage.

*Id.* at 949. The Court of Appeals therefore awarded the mortgagee interest until 1906, when the debt was paid. The case was affirmed by the Supreme Court, without much discussion of this point.

The recitation of facts in *Coder* does not expressly state whether or not the debtor's estate was solvent. Upon further scrutiny, it appears that the estate was insufficient to

pay all creditors in full. First, the court in *dictum* stated that it may have disallowed postpetition interest had the mortgagee been seeking to share with the unsecured creditors in a distribution of "common" property. Had the "common" property in the estate been sufficient to pay all creditors in full, there would have been no reason to disallow interest to the mortgagee, since the principle of equality of distribution would have been served, and *all* creditors would have received postpetition interest before a surplus would be returned to the debtor, under the rule laid down by the English courts since the 1700s and recognized in the *Sexton* case.

Secondly, and more importantly, the United States Supreme Court, in *Ticonic National Bank v. Sprague*, 303 U.S. 406, 58 S.Ct. 612, 82 L.Ed. 926 (1938), cited *Coder* for the proposition that postpetition interest was to be allowed to a secured creditor where the value of the security exceeded the debt, despite the fact that the estate was insolvent. The question arose in the analogous context of a bank insolvency, and was framed by the Supreme Court as follows:

> whether or not a secured creditor of a national bank, holding a non-interest bearing claim, is entitled to interest for any period subsequent to the insolvency of the bank, when the assets on which he has a lien are sufficient to pay the principal and interest but the total assets of the bank are not sufficient to pay in full all creditors' claims as of the date of insolvency.

*Id.* at 407, 58 S.Ct. at 613. The Court held that such a creditor was entitled to post-insolvency interest, and cited *Coder* for the proposition that the same rule applies in bankruptcy, "though interest will be denied the unsecured creditors if the assets are insufficient to pay all claims in full." The Supreme Court therefore placed secured creditors on a different footing, and allowed them postpetition interest where the value of their security was greater than the debt owed, even if the estate was insolvent. Its rationale was as follows:

> Secured creditors have two sources of payment for their claims—the liability of the debtor and the liability of the pledged or mortgaged assets. One is person, the oth-

er in rem. The liability in personam of the bank gives rise to a claim in rem against the free assets in the hands of the receiver; the claim in rem against the security continues as a claim in rem against that same security. With respect to the former the secured creditors have merely the same rights as any general creditor, and in so far as dividends are paid to secured creditors from free assets, they share ratably with the unsecured creditors, and their claims bear interest to the same date, that of insolvency. But to the extent that one debt is secured and another is not there is manifestly an inequality of rights between the secured and unsecured creditors, which cannot be affected by the principle of equality of distribution, and interest accruing after insolvency may not be withheld on account of that principle.... [W]e are of the opinion that a secured creditor of a national bank in receivership may enforce his lien against his security, where it is sufficient to cover both principal and interest, until his claim for both is satisfied.

*Id.* at 411–13, 58 S.Ct. at 614–15.

In sum, there were historically two separate exceptions to the general rule against postpetition interest. First, postpetition interest was allowed to creditors, secured or unsecured, where the estate was solvent and sufficient to pay such interest prior to returning funds to the debtor. Second, postpetition interest was allowed to a secured creditor where the value of the security exceeded the debt owed, even if the estate was insolvent or insufficient to pay such interest to unsecured creditors.

None of these early cases, however, involves the payment of compound interest, or interest on interest. That issue was addressed in *Vanston Bondholders Protective Committee v. Green*, 329 U.S. 156, 67 S.Ct. 237, 91 L.Ed. 162 (1946), *reh'g denied*, 329 U.S. 833, 67 S.Ct. 497, 91 L.Ed. 706 (1947), a case upon which the Debtor heavily relies. The Debtor cites *Vanston* for the proposition that the payment of interest upon interest is not in accord with the equitable principles underlying bankruptcy. In *Vanston*, a Kentucky District Court appointed a receiver to take exclusive control of all of the debtor's

properties and *enjoined the debtor's officers from paying its debts. Id.* at 158–59, 67 S.Ct. at 238 (emphasis added). At the time, there was no unpaid interest on the debtor's first mortgage bonds. *Id.* When the interest coupons fell due, the court did not direct the receiver to pay and the indenture trustee declared the entire principal due. *Id.* The indenture provided for payment of interest on unpaid interest.

In its review, the Supreme Court recited the general rule that interest stops accruing when a bankruptcy petition is filed, which is based in part upon the rationale that where the power of the debtor to pay its obligations is suspended by law, interest should not be paid because the delay is occasioned by the court's desire to preserve and protect the estate for the benefit of all interests involved. The Court then articulated the two historical exceptions and refused, on the facts, to apply either one to permit the payment of interest on interest:

> Simple interest on secured claims accruing after the petition was filed was denied unless the security was worth more than the sum of principal and interest due. To allow a secured creditor interest where his security was worth less than the value of his debt was thought to be inequitable to unsecured creditors.... But where an estate was ample to pay all creditors and to pay interest even after the petition was filed, equitable considerations were invoked to permit payment of this additional interest to the secured creditor rather than the debtor.

*Id.* at 164, 67 S.Ct. at 241 (citations omitted). The Debtor in *Vanston* was insolvent, but its assets were sufficient to pay the bond, including interest on interest. However, if such interest was paid, subordinate creditors would have received a greatly reduced share.[14] In such circumstances, where the Debtor was insolvent and the creditor's security was insufficient to pay its claim for interest on interest, the Court refused to invoke equity to allow interest on interest. In fact, the Court stated that to allow interest in such circumstances—where the debtor's failure to pay the coupons (thus triggering the interest-on-interest obligation) resulted from a court order *not* to pay them, entered to protect and preserve the estate pending a ratable distribution among all the creditors— would be inconsistent with equitable principles.

This Court does not believe that *Vanston* may be read as broadly as the Debtor advocates, *i.e.,* for the general proposition that interest on interest is inequitable. First, *Vanston* was decided under the Act which, as set forth above, contained no statutory counterpart to the present Section 506(b), which *requires* that interest be paid to oversecured creditors. In that sense, Section 506(b) may be viewed as codifying the pre-Code judicial exception which allowed postpetition interest where the security was worth more than the debt owed. To the extent that *Vanston* conflicts with Section 506(b), it has been superseded. *In re Sublett,* 895 F.2d 1381 (11th Cir.1990). Thus, to the extent that the Debtor cites *Vanston* for the proposition that the Court may disallow compound interest where Section 506(b) would allow it, its argument is without merit.

■ Second, the facts of this case are markedly distinguishable from those of *Vanston.* Here, there was no court order entered to preserve the estate for all creditors, which prevented the payment of interest. And perhaps most importantly, the Debtor does not dispute that the creditor in this case is oversecured: the value of its security exceeds the debt owed, thus implicating both Section 506(b) and the pre-Code exception to the general rule against post-petition interest, which was not at issue in *Vanston.* Moreover, the *Vanston* Court's concern for the ratable distribution between creditors does not arise in the present case. This is not a case in which a limited pool of assets is

---

**14.** From the fact that unsecured creditors would have received a greatly reduced share of the assets if interest on interest were paid, one can infer that although the debtor's *assets* were sufficient to pay interest on interest to the secured creditor, the creditor's *security* was insufficient to do so. If the security was worth more than the principal plus interest, then payment of interest upon interest would not have reduced the share paid to other creditors. Thus, the secured creditor in *Vanston* was undersecured, *and* the estate was insolvent.

available to satisfy the claims of creditors, both secured and unsecured, such that if interest is paid on senior claims, "subordinate creditors would receive a greatly reduced share...." Rather, the Debtor in this case is an ongoing business, funding its plan payments through operations. As noted above, unsecured creditors will receive 5% of their claims, regardless of the amount paid to the City. To the extent that the City's claim is reduced, the beneficiary of the reduction will be the Debtor and its principals, not the unsecured creditors of the estate. The principle of equality of distribution to creditors so central to the decision in *Vanston* is not at issue here. Indeed, the Court in *Vanston* recognized that equitable considerations permit payment of "additional interest to the secured creditor rather than to the debtor." *Id.* at 164, 67 S.Ct. at 240. This Court thus reads *Vanston* not for the general proposition that interest upon interest is inequitable, but for the proposition that the same equitable pre-Code principles which either permitted or denied the allowance of postpetition interest also govern the allowance of interest on interest.

██ The Debtor also relies upon *In re Sublett*, 895 F.2d 1381 (11th Cir.1990). *Sublett* was decided under the Code and therefore considered Section 506(b). The Debtor contends that *Sublett*

> established four criteria, each of which had to be met to entitle a secured creditor to interest on interest. They are as follows: (i) the creditor has to be an oversecured creditor; (ii) the claim for interest must be provided for by the loan instruments; (iii) the claim for interest must be reasonable under applicable state law; and (v) [sic] the debtor must prove to be solvent.

*See* Mem. of Law in Supp. of Debtor's Motion to Reduce and Fix the Debtor's Liability for Real Estate Taxes Owed City of New York ("Debtor's Mem."), at 7.

The Court disagrees that *Sublett* established any such four-part test. In *Sublett*, the debtors executed a promissory note, secured by a first mortgage on land, requiring them to pay 20 annual installments, consisting of principal plus 9% interest. During their chapter 11 case, the debtors sold a portion of the land and moved to pay out the proceeds to creditors. They proposed to pay the secured creditor the outstanding principal balance plus the contractual 9% interest computed annually. However, the creditor filed a claim seeking 12% interest on the interest portions of the installments unpaid during the chapter 11 case (postpetition, preconfirmation) as well as interest on the principal debt. The bankruptcy court, relying on *Vanston*, held that the interest on unpaid installments should be disallowed as "unfair" to the other creditors. The Court of Appeals for the Eleventh Circuit first noted that the Bankruptcy Code and cases interpreting it should have been the starting point for the analysis, rather than *Vanston*. The Court stated that reliance on *Vanston's* equitable principles was inappropriate because "whatever equitable powers remain must and can only be exercised within the confines of the Bankruptcy Code." *Sublett, supra*, 895 F.2d at 1385 (*quoting Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 206, 108 S.Ct. 963, 968-69, 99 L.Ed.2d 169 (1988)). The Court of Appeals further observed that "[a]ssuming that [the creditor's] claimed interest charges on the unpaid installments were 'provided for' by the loan instruments and were otherwise 'reasonable' under applicable Alabama law, [Section 506(b) ] ... precludes disallowance of those charges if [the creditor's] claim was in fact oversecured." *Sublett, supra*, 895 F.2d at 1385. Because the bankruptcy court had not made a factual finding as to whether the claim was oversecured, the Court held that the disallowance of the claim on the grounds stated in the opinion, *i.e.*, that allowance of interest on interest would be "unfair," was erroneous as a matter of law. The Court of Appeals also noted that the bankruptcy court's reliance on *Vanston* was flawed in a second respect: *Vanston* recognized the principle that claims for post-petition interest should be allowed in full where the debtor's estate is sufficient to pay the claims of all creditors (the "solvency" exception). Once again, the bankruptcy court had not made findings in that regard, and the Court of Appeals therefore remanded the case.

When viewed in its historical context, therefore, *Sublett* cannot be read to establish a four-part test for the allowance of interest on interest. First, the Court notes that if *Sublett* is read to mean that "the claim for interest must be provided for in the loan instruments" and "the claim for interest must be reasonable," (Debtor's Mem., at 7), its statements are in conflict with the holding of the Supreme Court of the United States in *United States v. Ron Pair Enterprises, Inc.,* *supra,* 489 U.S. at 241, 109 S.Ct. at 1030 ("The natural reading of [Section 506(b)] entitles the holder of an oversecured claim to postpetition interest and, in addition, gives one having a secured claim created pursuant to an agreement the right to reasonable fees, costs, and charges provided for in that agreement. Recovery of postpetition interest is unqualified. Recovery of fees, costs, and charges, however, is allowed only if they are reasonable and provided for in the agreement under which the claim arose"). *Ron Pair* made clear that interest under § 506(b) is available even in the absence of a consensual agreement, to nonconsensual, statutory tax lien creditors such as the City. The Debtor apparently recognizes that the City is not required to meet that prong of the test it asserts that *Sublett* lays down. Rather, the Debtor focuses upon the last prong; namely, that interest on interest is only available where the Debtor is solvent. However, the Court does not read *Sublett* as requiring *both* that the creditor be oversecured *and* that the Debtor's estate be solvent. Rather, *Sublett* states that interest must be allowed under § 506 where the creditor is oversecured, and it further suggests that interest *may* also be allowed under the pre-Code equitable exception in cases where the Debtor's estate is sufficient to pay claims in full.

In brief, *Sublett* merely imparts continued vitality to the pre-Code solvency exception. It does not purport to add judicial gloss to Section 506(b) by requiring not only that the creditor be oversecured, but that the debtor be solvent, as well. *Cf. Coder v. Arts, supra,* 152 F. 943; *Ticonic National Bank v.*

*Sprague, supra,* 303 U.S. 406, 58 S.Ct. 612, 82 L.Ed. 926 (both allowing postpetition interest where creditor was oversecured but estate insolvent); *In re Southeast Banking Corporation, supra,* 188 B.R. 452 (stating in *dictum* that oversecured creditors may claim postpetition interest against an insolvent estate).

The Debtor also cites *In re Manville Forest Products Corp.,* 60 B.R. 403 (S.D.N.Y. 1986), for the proposition that interest on interest will not be awarded when a debtor is insolvent. In that case, a *solvent* chapter 11 debtor defaulted on principal and interest due on long-term loans. The question was whether the debtor must pay interest on past due interest, as well as on past due principal. The bankruptcy court held that the debtor need not pay such compound interest, and the district court reversed, stating that under the case of *Debentureholders Protective Committee of Continental Inv. Corp. v. Continental Inv. Corp.,* 679 F.2d 264 (1st Cir.), *cert. denied,* 459 U.S. 894, 103 S.Ct. 192, 74 L.Ed.2d 155 (1982) (the "*CIC* case"), interest on interest is available from a solvent debtor. Notwithstanding its procedural history, the *Manville* case does not stand for the converse as Debtor argues, namely, that interest on interest is not available from an insolvent debtor. The question never arose in *Manville* because the debtor was solvent. The same may be said for the *CIC* case, which also involved a solvent debtor.[15]

The only case on all fours with the present case is *In re Greensboro Lumber Co.,* 183 B.R. 316 (Bankr.M.D.Ga.1995). In that case, the bankruptcy court concluded that the IRS was entitled to its statutory rate of interest under Section 506(b). Construing Section 6622 of the Internal Revenue Code which, in language virtually identical to Section 11–123, provides that interest shall be compounded daily, the *Greensboro Lumber* court held that daily compounding of interest was permissible, and allowed the IRS claim in an amount including such interest. *See also In re Chateaugay Corp.,* 150

15. In the *CIC* case, the Court did state in *dictum* that a provision allowing interest on interest would not be enforceable where the debtor was insolvent, citing *Vanston.* But for the reasons set forth above, this Court does not believe that *Vanston* may be read so broadly in light of the enactment of Section 506(b).

B.R. 529 (Bankr.S.D.N.Y.1993), *aff'd*, 170 B.R. 551 (S.D.N.Y.1994), in which former Chief Bankruptcy Judge Lifland held that N.Y. General Obligations Law § 5–527, which permits enforcement of compound interest provisions, could not be applied retroactively to validate the compound interest contained in an agreement entered into prior to that statute's enactment. By negative implication, the *Chateaugay Corp.* decision suggests that compound interest would be allowed where the agreement is entered into *after* enactment of the statute, and would thus be valid under New York law.

Accordingly, the Court concludes that the Debtor has not set forth sufficient reason or evidence by which this Court should deviate from the allowance under Section 506(b) of interest at the rate, and method of computation, set forth under New York law.

*B. The Claim for Taxes Accruing Postpetition*

■ The Debtor's motion does not address the City's contention that it holds a claim for unpaid postpetition taxes. The taxes which have accrued after the filing of the Debtor's petition constitute an administrative expense pursuant to 11 U.S.C. § 503(b)(1)(B)(i). *See, e.g., In re Mansfield Tire & Rubber Co.,* 85 B.R. 437 (Bankr. N.D.Ohio 1987).

### CONCLUSIONS OF LAW

1. This Court has jurisdiction over the subject matter and the parties to this core proceeding pursuant to 28 U.S.C. §§ 1334, 157(b)(2)(A), (B). Venue is proper. 28 U.S.C. § 1408.

2. With respect to taxes accruing prepetition, the City was and is entitled to charge, prior to the filing, interest on delinquent real estate taxes at the rate set forth in the Administrative Code, compounded in accordance with that statute.

3. With respect to taxes accruing prepetition, the Court hereby allows to the City, postpetition interest from the date of the filing to the effective date of the plan, at the rate set forth in the Administrative Code, compounded as set forth in that statute.

4. The parties are directed to confer with each other respecting the rate of interest to be paid post-confirmation, which shall be the current rate on a U.S. Treasury instrument with a maturity equivalent to the repayment schedule under the present plan, plus a risk premium of from one to three percent. Presumably, the parties will be able to stipulate as to the applicable rate and risk premium. If so, the parties shall file a stipulation with the Court no later than May 28, 1998. If the parties are unable to reach an agreement, they must advise the Court in writing by that same date, and the Court will schedule a further evidentiary hearing.

5. The taxes which have accrued after the filing of the Debtor's petition constitute an administrative expense pursuant to 11 U.S.C. § 503(b)(1)(B)(i).